UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No. 07-147 (GK) |
| | : | |
| FREDERICK S. HILL, | : | |
| DAN V. McKINNEY, and | : | |
| MOHAMED NGENA, | : | |
| | : | |
| Defendants | : | |

GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE:
OTHER CRIMES EVIDENCE PURSUANT TO RULE 404(b);
SELF-AUTHENTICATING DOCUMENTS PURSUANT TO RULE 902(11);
IMPEACHMENT BY PRIOR CONVICTION PURSUANT TO RULE 609; AND
CO-CONSPIRATOR STATEMENTS PURSUANT TO RULE 801(d)(2)(E)

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, hereby provides notice of its intent to introduce evidence in four categories under

the Federal Rules of Evidence ("FRE"):

1. Other Crimes Evidence (FRE 404(b));
2. Self-Authenticating Documents (FRE 902(11));
3. Impeachment by Prior Conviction (FRE 609); and
4. Co-conspirator statements (FRE 801(d)(2)(E)).

PROCEDURAL BACKGROUND

A federal grand jury has charged defendant Frederick "Steve" Hill, Dan McKinney and

Mohamed Ngena in an eight-count superseding indictment with Conspiracy and Aiding and

Abetting in violation of Title 18, United States Code, Sections 1349 and 2, and with seven counts

of Bank Fraud and Aiding and Abetting in violation of Title 18, United States Code, Sections

1344 and 2. The defendants are charged in various counts of the indictment as set forth below:

Count 1, Conspiracy - Hill, McKinney, Ngena and other coconspirators known and

unknown to the grand jury.

Counts 2 - 5, Bank Fraud - Ngena and other coconspirators known and unknown to the grand jury.

Count 6, Bank Fraud - Hill, McKinney, Ngena and other coconspirators known and unknown to the grand jury.

Counts 7 and 8, Bank Fraud - Hill, McKinney and other coconspirators known and unknown to the grand jury.

At trial, the government's evidence will establish that during the course of this conspiracy, from between on or about May 5, 2004 until on or about March 12, 2005, the defendants and other coconspirators engaged in a scheme to deposit and cash counterfeit checks both in the District of Columbia and in Las Vegas, Nevada. It total, the coconspirators sought to negotiate more than $923,960 in counterfeit checks.

## FACTS

This case involves a scheme to deposit and cash counterfeit checks both in D.C. and in Las Vegas, Nevada. The scheme began in May 2004, extended through March 2005, and involved between approximately $848,000 and $1,213,000 in counterfeit checks. Those involved in the scheme include defendants Mohamed Ngena, Frederick "Steve" Hill, and Dan McKinney, as well as Natwan Logan, a co-conspirator who previously has entered a guilty plea. In May 2004, Logan contacted a fellow Metropolitan Police Department officer, who, unbeknownst to Logan, was then cooperating with the Federal Bureau of Investigation ("FBI"). Logan spoke to the cooperating witness about engaging in a counterfeit check scheme in which the cooperating witness would furnish counterfeit checks and Logan would arrange for other co-conspirators to

2

cash the checks. In a series of recorded phone conversations meetings, Logan introduced the cooperating witness first to defendant Ngena and later to defendants Hill and McKinney as the coconspirators discussed various plans to cash counterfeit checks.

Initially, with the assistance of the FBI, the cooperating witness produced three counterfeit checks to Logan and defendant Ngena; however, defendant Ngena's name was misspelled on the checks (despite that Ngena had provided the spelling initially). As with all of the counterfeit checks produced by the cooperating witness, the counterfeit checks were written on a SunTrust bank account of a fictitious company, Premier Services. Despite the misspellings of his name, Ngena nonetheless concluded that he could cash one of the checks in the amount of $1,985. When he deposited it through an ATM, however, he failed to put in the check amount. This caused a delay and resulted in the Chevy Chase bank "red flagging" the account. As a result, when Ngena a few days later attempted to deposit a $7,495 counterfeit check also produced by the cooperating witness, the account was not available and Ngena became nervous about further transactions with Chevy Chase Bank.

Defendant Ngena then opened an account with SunTrust bank; however, efforts to deposit a $9,480 check were frustrated first because Ngena did not have proper identification, and later because the account was too new for Ngena to be able to begin to deposit and cash checks (the account was opened over the phone). Eventually, the cooperating witness produced a $15,000 Premier Services check which Ngena was able to deposit and cash at SunTrust Bank on July 20, 2004. Once deposited, however, Ngena began to withdraw money and never provided shares to the cooperating witness and Logan. Instead, Ngena fled with the proceeds.

3

Throughout this entire time period – May through August 2004 – Ngena, Logan, and the cooperating witness had numerous conversations about the various counterfeit checks, and most of these conversations were recorded. In these conversations, the coconspirators discuss various was to further the goals of the conspiracy by creating and depositing counterfeit checks.

Once it was clear that Ngena was fleeing with the $15,000, Logan turned his attention and the cooperating witness's toward Logan's "cousin" from Chicago. Logan claimed his cousin could handle large checks and, in an effort to get the cooperating witness to work with Logan's cousin, further talked about a recent deal in June 2004 in which Ngena and Logan furnished a $300,000 counterfeit check which was to be deposited into a bank account in Las Vegas for withdrawal. Indeed, Logan had described how he and Ngena created the check in June 2004 and sent it to Hill in Las Vegas. Bank records for defendant Dan McKinney's Las Vegas business account, Dan's Cleaning Service, establish that the check, issued on the account of an insurance company, was deposited on June 28, 2004 and flagged as fraudulent. No payment ever was made on the check.

With Ngena now fleeing, Logan suggested that he and the cooperating witness could use Logan's family in Chicago to cash large counterfeit checks. In late August, the cooperating witness was introduced to defendant Steve Hill, Logan's Chicago "cousin." In a series of recorded conversations, Hill informed the cooperating witness that Hill had access to an account in Las Vegas, Dan's Cleaning Service, that could be used to deposit large counterfeit checks. Bank records for defendant Dan McKinney's Dan's Cleaning Service account establish that in addition to the $300,000 counterfeit check produced by Logan and Ngena, on December 13, 2004, a counterfeit check in the amount of $365,000 also was deposited into the Dan's Cleaning

4

Service account. The $365,000 counterfeit check was deposited into the Dan's Cleaning Service account at roughly the same time as McKinney and Hill were withdrawing cashier's checks used to pay coconspirators their share of proceeds from the $15,000 counterfeit Premier Services check.

As a result of these discussions, in November 2004, the cooperating witness produced a $15,000 counterfeit Premier Services check payable to Dan's Cleaning Service and provided it to Logan, who in turned express mailed it to defendant Hill. With the assistance of Dan McKinney, Hill later deposited the check into the Dan's Cleaning Service account and withdrew four cashier's checks. In December 2004, Hill met with Logan and the cooperating witness in D.C. and delivered to him only $2,500 as his share from the check. In the meeting and a later recorded phone conversation, Hill explained that the cut was so small due to problems with the $300,000 counterfeit check Logan, Ngena, McKinney and Hill apparently had deposited in June. Because the funds were not there to cover the check, the check created problems for Hill's partner at the bank. Hill suggested to the cooperating witness that his cut from the $15,000 check was so small because taxes, penalties, and other deductions needed to be taken out of the check to offset problems with the $300,000 check. Hill emphasized that they tried to make a paper trail to make all of the checks look legitimate.

Hill, Logan, and the cooperating witness then began discussing a larger counterfeit check, and those conversations ultimately lead to an attempt to deposit a $500,000 check in Las Vegas in March 2005. In January 2005, Hill, Logan, the cooperating witness, and an undercover agent participated in a telephone conversation in which problems with the $15,000 check were discussed, and Hill suggested to the undercover agent (who was posing as the cooperating

5

witness's source) that Hill and his people could handle counterfeit checks written for as much as

$1,000,000 but nonetheless suggested that they try a check in an amount around $500,000.  For

the next two months, Hill, Logan, and the cooperating witness participated in a number of

recorded conversations in which they made plans for depositing the $500,000 check.

On March 1, 2005, Logan and the cooperating witness traveled to Las Vegas with the

$500,000 counterfeit Premier Services check and later met with McKinney and Hill to discuss

depositing the check the next day.  The four men then met again on March 2, 2005 and traveled

to a Bank of America branch.  McKinney went inside the bank to deposit the check, but,

according to McKinney, a bank employee told him that because of the size of the check, it would

take 14 days to clear.  McKinney as a result did not deposit the check but instead told the

cooperating witness that they should wire the funds instead.  McKinney handed to the

cooperating witness a Bank of America business card in the name of Ken Barnes which had

written on it the account and routing information for the Dan's Cleaning Service account into

which the funds were to be wired.

The FBI, however, already had made plans to arrest Logan in Las Vegas following the

attempt to deposit the $500,000 counterfeit check.  Logan was arrested in Las Vegas without

incident and he gave a complete statement to agents.  On March 9, 2005, the cooperating witness,

Hill, and an undercover agent had a telephone conversation about the $500,000 check, and Hill

said that he could make arrangements to have the check deposited into a Dan's Cleaning Service

account in D.C.  No further efforts were made, however, to deposit the $500,000 counterfeit

check.

In May 2005, both Hill and McKinney were interviewed by the FBI and gave inconsistent, though largely exculpatory, statements. A search warrant also was executed at the home of Dan McKinney, and a number of documents, including copies of checks and deposit slips relating to this scheme, were recovered.

In summary, the chart below sets forth the counterfeit checks that were deposited, or attempted to be deposited, as charged in the indictment:

| Check amount | Date | Bank | Participants |
|---|---|---|---|
| 1,985 (deposited) | 6-4-04 | Chevy Chase – DC | Ngena/Logan |
| 7,495 (attempt) | 6-8-04 | Chevy Chase – DC | Ngena/Logan |
| 9,480 (attempt) | 6-22-04 | Suntrust – DC/MD | Ngena/Logan |
| 300,000 (deposited) | 6-28-04 | Bank of America - Las Vegas | Ngena/Logan/Hill/ McKinney |
| 15,000 (deposited) | 7-20-04 | Suntrust – DC | Ngena/Logan |
| 15,000 (deposited) | 12-1-04 | Bank Of America – Las Vegas | Logan/Hill/McKinney |
| 500,000 (attempt) | 3-2-05 | Bank Of America – Las Vegas | Logan/Hill/McKinney |

## LEGAL ANALYSIS

### I.    Evidence of McKinney's Attempt to Negotiate a $365,000 counterfeit check is Admissible as "Other Crimes" Evidence under FRE 404(b)

As noted above, on December 13, 2004, defendant McKinney endorsed and deposited into his Bank of America business account a $365,000 cashier's check drawn from the St. Martin Bank and Trust in St. Martinville, LA and made out to "Dan's Cleaning Service", a company owned by defendant Dan McKinney. See Attachment A, copy of $365,000 check[1]. The $365,000 counterfeit check was deposited into the Dan's Cleaning Service account at roughly the same time as McKinney and Hill were withdrawing cashier's checks used to pay coconspirators

---

[1]All of the documents referenced herein have previously been provided to all counsel.

their share of proceeds from the $15,000 counterfeit Premier Services check. The $365,000

counterfeit check was not honored by the Bank of America as set forth in a letter sent to Dan

McKinney. See Attachment B, letter from Bank of America to Dan McKinney. The government

submits that while not charged, this conduct is admissible evidence pursuant to Federal Rule of

Evidence 404(b).

Rule 404(b) of the Federal Rules of Evidence governs the admission of other crimes,

wrongs or acts of the defendant. Evidence of other crimes, wrongs or acts is admissible under

Fed. R. Evid. 404(b) if offered for a permissible purpose. Such permissible purposes include

proof of intent, motive, opportunity, plan, knowledge, identity or absence of mistake or accident.

United States v. Miller, 895 F.2d 1431, 1436 (D.C. Cir. 1990), cert. denied, 498 U.S. 825 (1990).

"[U]nder Rule 404(b), *any* purpose for which bad acts evidence is introduced is a proper purpose

so long as the evidence is not offered *solely* to prove bad character." Id. (emphasis in original). In

determining whether such evidence is admissible, the Court undertakes a two part analysis. First,

the Court considers whether the evidence is "probative of some material issue other than

character." United States v. Clarke, 24 F.3d 257, 264 (D.C. Cir. 1994). If the Court deems the

evidence to be relevant, the Court should exclude the evidence only if its probative value "is

substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; United States v.

Day, 591 F.2d 861, 878 (D.C. Cir. 1978); see also Huddleston v. United States, 485 U.S. 681,

686 (1988). Our Circuit has described the rule as one "of inclusion rather than exclusion," United

States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000). Rule 404(b) excludes only evidence that "is

offered for the sole purpose of proving that a person's actions conformed to his or her character,"

United States v. Long, 328 F.3d 655, 661 (D.C. Cir.), cert. denied, 540 U.S. 1075 (2003). As the

D.C. Circuit stated just last year, "a Rule 404(b) objection will not be sustained if: 1) the evidence of other crimes or acts is relevant in that it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence;' 2) the fact of consequence to which the evidence is directed related to a matter in issue other than the defendant's character or propensity to commit crime; and 3) the evidence is sufficient to support a jury finding that the defendant committed the other crime or act." United States v. Douglas, 482 F.3d 591, 596 (D.C. Cir. 2007)(citations omitted).

Rule 404(b) "does not prohibit character evidence" but only "that which lacks *any* purpose but proving character." United States v. Douglas, 482 F.3d at 596 (citations omitted)(emphasis in original). Rule 404(b) excludes only evidence that "is offered for the *sole purpose* of proving that a person's actions conformed to his or her character." United States v. Long, 328 F.3d 655, 661 (D.C. Cir.) (emphasis added), cert. denied, 540 U.S. 1075 (2003).

The 404(b) evidence of McKinney's attempt, during the conspiracy, to negotiate the counterfeit check in the amount of $365,000 made payable to "Dan's Cleaning Service" is admissible because it goes to McKinney's knowledge, intent, preparation, plan, and the absence of mistake or accident. Application of the legal principles surrounding Rule 404(b) demonstrates that the offered evidence is probative of relevant issues and should be admitted. For these reasons, the government respectfully requests permission to introduce the foregoing evidence under FRE 404(b) as "other crimes evidence".

The indictment charges the defendant and others with engaging in a scheme to defraud financial institutions and to obtain money owned by and under the custody or control of financial

institutions by means of false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1344.   Part of the preparation and planning during the scheme could be to identify and test different avenues and means for passing fraudulent checks. For example, the success, or lack thereof, in one attempt, teaches the coconspirators something about how to best proceed in the next attempt.   By experimenting with checks drawn on different accounts and using different dollar amounts, the coconspirators could determine what works and what does not work and modify their criminal venture accordingly.   Thus, prior to attempting to negotiate the $365,000 check by depositing it in the "Dan's Cleaning Service" account at Bank of America in Las Vegas, Nevada, the coconspirators had made attempts, as set forth above, to negotiate a $300,000 check, which failed, and to negotiate a $15,000 check, which succeeded. Then came the $365,000 check that is the subject of this notice, followed by an attempt to negotiate a $500,000 check.   This shows a clear trial and error pattern and the $365,000 check is one step in the process of fine-tuning the conspiracy to achieve success.

If defendant Dan McKinney claims that he "mistakenly" deposited the $500,000 check without exercising any degree of diligence or asking any questions about the origins or legitimacy of the check – akin to willful blindness – then evidence of the failed attempt to negotiate the $365,000 check, just months before, is probative of his absence of mistake.   Yet again, just as with the $300,000 check, McKinney deposited a check in a large dollar amount into his business account only to receive notice from Bank of America that the check would not be honored. Leading up to the failed attempt to negotiate the $500,000 check was the failed $300,000 check and then the $365,000 check at issue here.   The government submits that this evidence is highly probative and should be admitted.   Moreover, McKinney's conduct, as set forth above, shows a

10

"'pattern of operation that would suggest intent' and that tends to undermine the defendant's innocent explanation." United States v. Long, 328 F.3d at 661. McKinney's attempt to negotiate the $365,000 check is evidence of his intent as to the charged crimes.

One of the basic issues in the trial of McKinney, if not the issue in the trial, will be the defendant's intent to defraud. McKinney may well claim that he is an "innocent dupe" who was victimized by the other coconspirators and is guilty of nothing more than ignorance and trusting the wrong people. In order to determine the defendant's intent, the jury might be aided by evidence that McKinney tried to negotiate yet another large counterfeit check during the same time frame. The fact that the defendant tried to defraud the Bank of America out of $365,000 is evidence of his intent to defraud as to the other checks charged in the indictment. In fraud cases, courts have allowed evidence of other economic crimes evidence in order to assist the jury in determining the defendant's intent. See United States v. Wonderly, 70 F.3d 1020 (8th Cir. 1995) (post-indictment conduct of scam with other investors admissible as evidence of intent and knowledge and whether defendant was truthful in her claim that she believed investment opportunities were "virtually risk-free"), cert. denied, 517 U.S. 1146 (1996); United States v. Harris, 185 F.3d 999 (9th Cir.) (other crimes evidence of misappropriated money in unrelated partnership admissible as relevant to intent and absence of mistake in pension fund theft case), cert. denied, 528 U.S. 1055 (1999).

If the Court deems the evidence to be relevant, the Court should exclude the evidence only if its probative value "is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; see also Huddleston v. United States, 485 U.S. 681, 686 (1988).

> [T]he language of Rule 403 tilts, as do the rules as a whole, toward the admission
> of evidence in close cases. . . . [I]n determining whether the probative value is

11

> *substantially* outweighed by the danger of *unfair* prejudice it is a sound rule that
> the balance should be struck in favor of admission when the evidence indicates a
> close relationship to the event charged.

United States v. Clarke, 24 F.3d 257, 265-66 (D.C. Cir. 1994) (emphasis in original) (internal

quotation marks and citations omitted).  In the instant case, the probative value of the evidence

outweighs its danger of unfair prejudice to McKinney.  As discussed above, the other crimes

evidence demonstrates McKinney's knowledge, intent, preparation, plan, and the absence of

mistake or accident, rather than any criminal propensities; it is therefore probative.

Unfair prejudice only exists when the relevant evidence misleads or confuses the jury into

finding the defendant guilty of the other crime, rather than the charged crime. "The term 'unfair

prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant

evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the

offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997) (internal citations and

quotation marks omitted).  Further, a primary goal of Rule 403 is to avoid a case in which "the

jury may choose to punish the defendant for the similar rather than the charged act, or the jury

may infer that the defendant is an evil person inclined to violate the law." Huddleston, 485 U.S.

at 686.

The danger of unfair prejudice to defendant McKinney is minimal.  Rule 403 is not meant

to exclude all evidence of crimes, since Rule 404(b) expressly permits the introduction of that

evidence; therefore, the fact that it is evidence of a crime does not make it automatically

prejudicial.  Further, there is little danger of jury confusion on the crimes at issue.  Therefore, the

Court should allow the use of the effort to negotiate the $365,000 check as "other crimes"

evidence.

## II.     Self-Authenticating Documents Pursuant to Rule 902(11) are Admissible.

The Federal Rules of Evidence allows for business records to be admitted in evidence at trial without a custodian of records testifying about their authenticity.[2] See FRE 902(11).  Rule 902(11) also directs the party intending to offer a record in evidence pursuant to the rule to provide notice and to make the documents and declarations available to the opposing party.

Pursuant to Rule 902(11), the government hereby gives written notice of its intention to introduce evidence consisting of business records from the following entities.  The government has provided copies of these documents to the defense in discovery.  Well before trial, the government will submit to the defense an evidence list setting forth the precise documents the government intends to introduce at trial.  In summary, these documents include:

1.     Bank of America bank records

2.     SunTrust Bank bank records

3.     Chevy Chase Bank bank records

4.     National City Bank bank records

5.     Postal and Federal Express records

6.     Airline records[3]

By seeking to admit evidence pursuant to Rule 902(11), the government anticipates that its witness list will be greatly reduced.[4]

---

[2]   Alternatively, the defense may agree to stipulate that these records are admissible as business records.

[3] The government reserves its right to amend this list if additional records are obtained before trial.  Copies of the documents and notice will be given to the defense.

[4] The government reserves the right to call representatives from some of these companies.

13

Federal Rule of Evidence 104(a) provides that preliminary questions concerning the admissibility of evidence shall be determined by the court, and that in making such determinations courts are "not bound by the rules of evidence" (except those with respect to privileges). The government seeks to admit the documents themselves and not the declarations.

**III.    Ngena's Prior Conviction for Forgery is Impeachable under Fed. R. Cr. P. 609.**

Defendant Mohammed Ngena has been convicted of the following impeachable criminal offenses:

- 4 counts of Second Degree Forgery, DeKalb County, Georgia, (1/4/08)

If the defendant testifies at trial, the government should be permitted to impeach Ngena with his prior conviction.

Federal Rule of Evidence 609(a)(2) directs that a prior conviction "shall be admitted if it involved dishonesty or false statement. . ." (emphasis added).  Unlike a felony conviction under Rule 609(a), a crime involving "dishonesty or false statement" is not restricted to admission subject to the requirements of Federal Rule of Evidence 403 (requiring balancing of probative value and prejudicial effect of evidence).   Rather, the rule directs that a  conviction for a crime involving dishonesty or false statement "shall" be admitted.  Because Ngena's convictions are for crimes involving "dishonesty or false statement," no balancing is required.  United States v. Papa, 560 F.2d 827 (7th Cir. 1977) (impeachment with misdemeanor theft conviction proper where original charge was forgery and defendant pled guilty to lesser charge);  United States  v. Tone, 615 F.2d 277 (5th Cir.) ("prior conviction for an offense such as mail fraud is always admissible for impeachment purposes"), cert. denied, 449 U.S. 985 (1980); United States v. Leyva, 659 F.2d 118 (9th Cir. 1981), cert. denied, 454 U.S. 1156 (1982).

14

IV. **Coconspirator Statements**

As described more fully above, throughout the course of the conspiracy, the coconspirators made numerous statements in furtherance of the conspiracy. In conversations too numerous to list here, the co-conspirators, in various conversations, discussed plans to create, deposit, and cash numerous counterfeit checks. They discussed efforts to avoid detection and the manner in which they would split and spend proceeds from their illegal scheme. Attached is a transcript of a conversation on January 10, 2005, Attachment C, that is an example of one such conversation between defendant Hill, Logan, the cooperating witness, and an undercover agent in which the scheme to create and deposit a $500,000 check is discussed. These, and all other statements between and among the co-conspirators between May 2004 and March 2005 are admissible and are not properly subject to a hearsay objection.

A statement by a coconspirator of a party during the course and in furtherance of the conspiracy is not hearsay under Federal Rule of Evidence 801(d)(2)(E). FRE 801(d)(2)(E) "embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are ... admissible against the others, if made in furtherance of the common goal." United States v. Gewin, 471 F.3d 197, 201 (D.C. Cir. 2006)(*quoting* United States v. Weisz, 718 F.2d 413, 433 (D.C. Cir. 1983)). "[C]oconspirators' statements, when made in the course and in furtherance of the conspiracy, have a long tradition of being outside the compass of the general hearsay exclusion." Bourjaily v. United States, 483 U.S. 171, 183 (1987). The existence of the conspiracy and the participation of the declarant and the non-offering party are preliminary question of fact to be resolved by the court under FRE 104. Id. at 175. "[W]hen the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering

party must prove them by a preponderance of the evidence." Id. at 176.[5] "Although *Bourjaily*

allowed courts to consider the content of the out-of-court statements in making this

determination, and left open whether such statements *alone* could support the necessary finding,

[the D.C.] circuit has held that the finding must rest on some independent evidence of the

conspiracy. A court can preliminarily admit hearsay statements of coconspirators, subject to

connection through proof of conspiracy." Gewin, 471 F.3d at 201(emphasis in original; internal

citations omitted). No showing of unavailability of the declarant is required. United States v.

Inadi, 475 U.S. 387 (1986). "Because they are made while the conspiracy is in progress, such

statement provide evidence of the conspiracy's context that cannot be replicated, even if the

declarant testifies to the same matters in court." Id. at 395. "[C]o-conspirator statements derive

much of their value from the fact that they are made in a context very different from trial, and

therefore are usually irreplaceable as substantive evidence." Id. at 395-96

Here, the government will be offering in evidence numerous tape recorded conversations,

both over the telephone and in person, which will contain coconspirators' statements made during

and in furtherance of the conspiracy. As suggested by the court in Gewin, the government

requests that the court admit these statements subject to connection through proof of the

conspiracy. The government will produce ample independent evidence of the existence of the

conspiracy, including testimony of a cooperating witness, testimony of a coconspirator, video

surveillance tapes, and documentary evidence, including copies of the deposited counterfeit

checks and bank records establishing both that checks were deposited and that proceeds were

---

[5] The Court in Bourjaily also held that "the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E). Id. at 183-184.

obtained by the coconspirators.

One piece of evidence the government will present is a tape-recorded telephone conversation between defendant Hill, an undercover agent, and the cooperating witness on March 11, 2005, in which there is discussion of the events that occurred previously that month in Las Vegas. The defendants may argue that the portion of the recording that discusses past events is not in furtherance of the conspiracy. This argument is without merit. As the conspiracy progressed, there were numerous discussions of what tactics should be used to maximize the chances of success, which necessarily included discussions of past activities in the conspiracy. In this particular conversation, a transcript of which also is provided as Attachment D, defendant Hill is attempting to explain past conduct on the part of co-conspirators to convince the cooperating witness and the undercover agent, posing as the cooperating witness's source for counterfeit checks, to continue to supply larger counterfeit checks in the future. Indeed, defendant Hill implores the undercover agent to approve of a plan to deposit the counterfeit $500,000 check into the Dan's Cleaning Service account through a Bank of America branch in D.C. Plainly, this was an effort to continue and further the efforts of the conspiracy, albeit in part in the context of past conduct by the co-conspirators. Thus, the tape-recorded conversation of March 11, 2005 between defendant Hill, the undercover agent, and the cooperating witness, was in furtherance of the conspiracy and should be admitted. See generally United States v. Walls, 70 F.3d 1323, 1327 (D.C. Cir. 1995)(coconspirator's statements in conversation with undercover officer giving background information on key players and cautioning about other co-conspirators were "in furtherance of the conspiracy"), cert. denied, 517 U.S. 1147 (1996).

17

## CONCLUSION

The government hereby requests that the Court permit it to introduce: 1) other crimes evidence; 2) business documents through Rule 902(11) declarations; 3) impeachable convictions; and 4) coconspirator statements.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

_____/s/_____

Thomas J. Hibarger
Assistant United States Attorney
D.C. Bar No. 413224
555 4th Street, N.W., Room 5237
Washington, DC 20530
(202) 514-7385
Thomas.J.Hibarger@usdoj.gov


_____/s/_____

G. Bradley Weinsheimer
Assistant United States Attorney
Bar Number 431796
555 4th Street, N.W., Room 3205
Washington, DC 20530
(202) 514-6991
Bradley.Weinsheimer@usdoj.gov

# EXHIBIT A

Amount:                $365,000.00
Account:               4670326404
Bank Number:           05190035
Check Number:          0
Sequence Number:       2150733106
Capture Date:          12/13/04



ST. MARTINVILLE  HOME  OF THE ORIGINAL EVANGELINE OAK AND THE LONGFELLOW · EVANGELINE · MEMORIAL PARK

**CASHIER'S CHECK**  467032640

**St. Martin Bank & Trust Co.**
ST MARTINVILLE LOUISIANA

November 30, 2004

PAY TO THE
ORDER OF    Dan Cleaning Service

$365,000.00    DOLLARS

ST. MARTIN
BANK    365,000dol's00cts

**FDIC**    Brenda Evans
AUTHORIZED SIGNATURE

PAYABLE THROUGH
BB&T
CHARLESTON, WV

⑈05190035⑈⑈00467  0326404⑈    ⑈0036500000⑈



# EXHIBIT B



**Bank of America**

```
                              NEVADA RETURN ITEMS
                              P.O. BOX 2518
                              HOUSTON, TX 77252-2518

DATE: 12-17-2004


        DAN'S CLEANING SERVICE, LLC
        5720 WILLOWCREEK RD
        NORTH LAS VEGAS NV  89031-1419
```

*(handwritten notes)* Wire Routing Dewica / Wire Not # / 026 009 593

```
DEAR VALUED CUSTOMER:

WE HAVE BEEN NOTIFIED BY ONE VALLEY BANK N.A.
THAT AN ITEM DRAWN ON THEIR BANK AND DEPOSITED TO YOUR ACCOUNT
00000004961970835, WILL BE RETURNED TO BANK OF AMERICA UNPAID.  WE ARE
REDUCING THE AVAILABILITY OF FUNDS IN YOUR ACCOUNT FOR THE ITEM AMOUNT
SHOWN BELOW FOR FIVE BUSINESS DAYS OR UNTIL THE ITEM IS RECEIVED.  UPON
RECEIPT OF THE ITEM, WE WILL CHARGE IT BACK TO YOUR ACCOUNT AND RETURN
IT TO YOU UNLESS YOU HAVE AN AGREEMENT WITH US FOR SPECIAL HANDLING OF
RETURNED DEPOSITED ITEMS.  THE INFORMATION WE HAVE REGARDING THIS ITEM
IS AS FOLLOWS:

ITEM AMOUNT:                 $365,000.00
DATE DEPOSITED:              12-13-2004
DEPOSIT AMOUNT:              $370,000.00
CHARGE TO ACCOUNT NUMBER: 4961970835
STORE NUMBER:                0
WRITTEN BY:                  ST MARTIN B & T
PAYEE NAME:                  DAN CLEANING SERVICE
RETURN REASON:               REFER TO ITEM

IN THE EVENT THIS ITEM SHOULD BE PAID AND NOT RETURNED TO US BY THE
BANK SHOWN ABOVE, THESE FUNDS WILL BE MADE AVAILABLE TO YOU ON THE
SIXTH BUSINESS DAY FROM THE DATE OF THIS NOTICE.  IF THERE ARE ANY
FEES ASSESSED SOLELY AS A RESULT OF THE DELAY WE IMPOSED ON THE
AVAILABILITY OF FUNDS, PLEASE CONTACT OUR CUSTOMER SERVICE
REPRESENTATIVES AT 1-800-432-1000

THANK YOU FOR CHOOSING BANK OF AMERICA.


SINCERELY,


RETURN ITEMS DEPARTMENT
```

```
                              BANK NUMBER:           336
                              CONTROL NUMBER: 011-000150091
```

# EXHIBIT C

ID-93

WFO   194C-WF-229363
DATE:   January 10,  2005
TIME:   11:30 am et seq.

UNDERCOVER EMPLOYEE #3362 (UCE)
COOPERATING WITNESS      (CW)
NATWAN  LOGAN            (NL)
STEVE HILL              (SH)

UCE:   This is..uh..undercover employee number 3362.  Today's date is January 10, 2005.
I..uh...will be placing a call to subject Steve Hill and Natwan Logan.  The time is approximately
11:30 am on that January 10th, 2005, and I'll be calling..uh.. Logan on telephone
number..er..excuse me I'll be calling..uh..Joe..uhh...on telephone number (202) 246-6709.  He in
turn will be placing a call to Natwan Logan who in turn we're expected to..uh..also uh..place on
the line Steve Hill.  Uh...and then eventually it'll be all four of us...uh.

CW:   Hello..you there?

UCE:   Hey.

CW:   Ok.

[Phone ringing]

CW:   Oh man..

VOICE MAIL:  You have reached the Sprint voice mailbox of 2...

CW:   Let's try him again, hold on.

UCE:   Alright.

[Phone ringing]

CW:   Hello?

UCE:   Hey, I'm here.

CW:   Ok....you still there?

UCE:   Yup.

CW:   Alright..

[Phone ringing]

CW:    I'm gonna' leave him a message....say man look man, I got my man on the phone and...

VOICE MAIL:  You have reached the Sprint voice mail..

[Beep]

CW:    Hey man, I got my man on the phone, Joe.  I mean I told you I was gonna' be callin' in an hour.  Now you..now you fuckin' up the party now man.  Give me a call back.

[Phone ringing]

UCE:  [clearing throat]

VOICE MAIL:  Hi.  You've reached 301..

CW:    Hello.

UCE:        Yo.

UCE:  The time now is approximately 11:50 am and we'll be attempting to recontact..uh..Natwan Logan through..uh..Joe.

CW:    Let's roll Georgie.

UCE:  Ready to go.

CW:    Alright.

[Phone ringing]

CW:    George.

UCE:  Yo.

CW:    Alright..

UCE:  Right here...

[Phone ringing]

NL:    Yo.

CW:    What's the deal Holmes?

NL:    What's up man?  I'm at the fuckin' towin' and shit...transferin' this shit to the rental car.

CW:    Right.

NL:    What's up?

UCE:   Hey.

CW:    I got my..I got my man on the phone.

NL:    Alright...

CW:    Yeah I called..

NL:    Uh...

UCE:   Hey how you doin'?  How you doin'?

NL:    Hey what's up man?  Hey what's going on?

UCE:   You need to..uh...need to make some money to get a new car?  Is that it?

NL:    Yeah man..[laughs]...you know it...[laughs]..

CW:    [Laughs...]

UCE:   [Laughs...]....well I think we can all work something out then.

NL:    Yeah let me...uh...let me call Steve now.

UCE:   Alright.

NL:    Hello?

UCE:   Yup..I'm right here...

NL:    Alright hold on...

UCE:   [Clears throat]..

CW:    Yeah man cause that last one we did was..I mean I don't know...I didn't understand the reason why we got that little bit of money in the first place either.

UCE:   Oh.

NL:    Yo.

UCE:  Right...Hello.

NL:   Hello?

CW:   Yeah.

NL:   Steve?

SH:   U/I..

NL:   Steve?

SH:   Alright.

NL:   He on the line.

SH:   Joe on the line?

UCE:  Yeah I'm here.

CW:   Yeah.

SH:   What's going on little brother?  Happy New Years to you boy.

UCE:  Yeah...

CW:   Thank you.  Same to you.

UCE:  ...likewise back to you.  Hey Steve?

SH:   Yeah my brother.

UCE:  Hey listen...umm...let me..

CW:   That's my man Steve..Steve, that's uh..my folks on the line man.

SH:   Oh that's Joe folks?

UCE:  Yeah.

CW:   Yeah.

SH:   Ok how you doin' my brother?  Happy New Years to you.

UCE:  Yeah likewise.  Hey we need..we need to help...we need to help my man out back here.

Get him a new car.

[LAUGHTER]

UCE:    See what I'm sayin'?

SH:     Yeah..u/i..

UCE:    So..

SH:     ...my little brother was tellin' me about it.

UCE:    ..so so so we all need to make some money, right?  Listen..uhh...you know, I..we can uhh...I'm not gonna' say a whole lot over the phone because uh..you know my man uh...here Joe is gonna' handle everything for us, right?

SH:     Well you don't have to.  We already know what's up, right?

UCE:    Yeah, and uh...you kn..you know...you..you look like you know what you're doin' but I guess the first one, you know, didn't look too good.  And..

SH:     Uhh...well no it most definitely...I explained that to Joe what happened on that.  They can explain that to you then over the phone, you know..

UCE:    Right.

SH:     U/i...there was an incident that happened they knew about..you know that one got penalized there, but everything else, like I told 'em..it was...it was smooth from here, you know.

UCE:    Right..right..cause I guess that..that that that first one, uhh...the guy took a powder on all of us and uhh...he, he..he took it and ran, so..you know if uhh..we..if you...if you know...if you know where he is, I'd like to know about it.  Right?

CW:     That that that's...that's Natwan uhh...

NL:     Yeah that...that was on...yeah that was on me.

UCE:    Yeah.  No well you know it..it wasn't on..on you.  It was uhh..who..who we gave it to and uhh...who  left.  But..but the second one I understand uhh..you know we had some uh...some charges that we had to take care of, so...

SH:     U/I...yeah you know somethin'...you know somethin' that happened in July took so long you know...then with my people, you know...puttin' off puttin' off puttin' off, you know.  They not concerned about...who doin' what on that end, just...who I'm dealin' with at the bank, they concerned about them having to be taken care of.

UCE:    Right right.  Well you know...

SH:    And...u/i...

UCE:    Well...we..

SH:    Huh?

UCE:    We all...we all want a..want a bigger piece of the pie, we gotta' put more bread on the table, right?

SH:    Most definitely.

UCE:    But uh...

SH:    and..u/i..

UCE:    Well listen.  I got...I got you know, this seems to be working out pretty good 'cause it seems like you know what you're doing, right?

SH:    Most definitely buddy, and I see you all know what you all doin' on your end, so we'll have no problem.

UCE:    Right.  Cause uh...you know like..like I told my man on this end uh...I don't want to see no amateur hour because if we're gonna' step this thing up, uh...you know..I don't want uh...you know, you stick your...you stick your neck out enough where..where you get it just nicked a little bit.  You don't want to get it cut, you see?

SH:    Want somethin' about this my brother?  I'm the realist man, one thing about it..

UCE:    Alright..so you're a professional, right?

SH:    You ain't gotta' worry about none of that other stuff that happened.  I heard about what happened earlier.  I don't play those games.  I'm a businessman, and I can keep business as business.

UCE:    Well thats all..I've only heard good things about you, so you're..you're a professional at this, right?  So I ain't gotta' worry about nothin'?

SH:    My brother.

UCE:    Alright.

SH:    Definitely.

UCE:   Because uh..I got..I'm gonna' have another one coming your way, alright?  And I'm gonna' have uh..have uh Joe handle it for me.

SH:    Ok..

UCE:   Is that al..is that alright with you?

SH:    I'm just waitin' on you all, you know.  Like I tell you, get it while the gettin' is good.  Let's do it.

UCE:   Alright.

SH:    Instead of sittin' around holdin' back, procrastinating.  Let's done put it together where we can make a...make a difference here.

UCE:   Alright we gonna'...we gonna' do it the same way as the last time?  Through the same company and everything?

SH:    Exactly.

UCE:   Alright. Let..let me...let me..now now I want you to give me a number because I want you to tell me what you're comfortable with because I'm not going to do anything because you know, this is a long term thing.  I'm not...I'm not lookin' in the short term, so we're gonna' do stuff that's uh..nice and uh..careful and uh..we can go on from there.  What...what's the largest you can handle?

SH:    You know, well...I can handle a mill, anything above whatever, but we do like I told them..just send..just send me...gonna' send me uh...a half...500, whatever.

UCE:   Alright. Alright..I might..I might go..I might go a little lower than that, but it's gonna' be...a hell of a lot more than what we just did, alright?

SH:    Oh ok, well you know, whatever..like I said, whatever you all want to send, you know, is fine.  Right.

UCE:   Alright.

SH:    Whatever.

UCE:   Alright.  Because I..I..I feel comfortable that it's gonna' be done the right way, and uh..I..I may even have, uh...I may even have Joe uh..handle the whole thing with you out..out..out west, right?

SH:    Which it don't make a difference, like I was tellin' Joe.  One thing about this when we do it..once you put it in, it gonna' take, you know...five good..good days to clear.

UCE:   Yeah.

SH:    And then before we touch anything, he can fly in and whatever, you know and..and come on in and then I can...what ever I have to do to get it to him right there, you know, he can be right there with me. There's no problem, you know. There's nothing to hide. I'm a businessman.

UCE:   Yeah yeah. Ok well that's alright because uh..because I'm sure uh..Joe ain't gonna' mind me saying he won't...he won't mind a little filet mignon out west.

CW:    Hey naw..I'm ready to roll..

UCE:   Right? [LAUGHS]   That right Joe?

CW:    I'm ready...I'm ready to roll out that mother fucker.

NL:    Yeah.

CW:    I ain't never been there. I never been to Vegas.

SH:    See I don't want...

UCE:   You see...hey Steve, Steve...see what I'm talkin' about? You see?

SH:    U/I....

UCE:   He's all...[LAUGHS].

SH:    Yo yo Joe. I don't want Joe out there no whole..week or whatever, you know. That's why I was sayin', wait until like the third, fourth day, or whatever. I'll call and say ok, let's come on out and meet me out there..

UCE:   Yeah.

SH:    And we'll take it from there...

UCE:   Yeah. Well he...he'll probably will hand carry the whole thing, you know? He'll probably come out and uh...I'll I'll I'll take care of him on this end. I'll take care of Joe. He knows that.

SH:    Ok that's no problem. I understand that.

UCE:   Because I...because I know it's gonna' be done the right way, you know?

SH:    Hey..you all have...you all handle your all business. I handle mine. Mine's gonna' be taken care of, we got no problem. We gon...we gonna' feed each other.

UCE:   Alright.

SH:    That's the way I explained my end to Joe.  He know what I...me and Joe bonded from the beginning.  I'm a businessman, like I tell him.  I come in myself.

UCE:   Ok.

SH:    I don't have to send nobody.  I take care of myself.  Keep less peoples involved with our business,,,

UCE:   Exactly.

SH:    U/I...

UCE:   Exactly.  Well, that..that shows me you know what you're doing.  I..I..the..the only thing is, something that large ain't gonna' come back on me and you going through that same company, is it?

SH:    Naw naw naw...what I..

UCE:   It's alright?

SH:    See what I do...I set up a..a..I set up a business deal up of a business trail.  You make a paper trail to make everything look legit, it comes on no one.

UCE:   Ok.  Alright.

SH:    U/I..business.  The trail is made..paper trail made.  Looks business wise.  No back feed. We need no feedback.

UCE:   Ok.

SH:    That's the whole point.  My only thing is...long as everything is there on that end when it's dealin' on my end..

UCE:   Right.

SH:    And transitions are made...transactions?

UCE:   Yup.

SH:    That's no problem.  It just have to be there.

UCE:   Alright.  Well you're a professional.  I owe you a cocktail, Steve.

SH:    Ok my brother.

UCE:   You, you drink?

SH:    U/I...

UCE:   You have...you have..you have a little..you have a little cognac once in awhile, maybe?

SH:    I'm not a big drinker, but I, you know, business wise I'll take a nip with you.

UCE:   Oh there we go. There we go.

CW:    But look, there ain't no drinkin' gonna' be done until this deal get done, you know what I mean?  I mean..

NL:    Yeah, right.

CW:    ...you know all the drinkin' is fine in the world, you know...

UCE:   No no no, we don't mix business and pleasure here.

CW:    Right right.

NL:    U/I...

SH:    U/I...

UCE:   After it..after it's done.

SH:    When we take care of this business, we can fly to Italy god damn it and have us a drink, you..u/i..

CW:    [LAUGHS]

UCE:   [LAUGHS] Yeah yeah.

CW:    Yeah yeah yeah, but um..you know on top of that man, no disrespect to old Steve, man.  I keep my contacts like separate from my um..cause that'll..that..that'll, you know what I mean?

SH:    Hey Joe?  Me and  you went over that then.

CW:    Yeah alright.

SH:    Yeah cause I don't have to meet...it's up to you, you know.  It's love regardless.  I don't care if I  meet your guy.

CW:    Yeah, yeah..

SH:    I'll never cut you out on whatever.  I'm the businessman man.  I've been here..

CW:    You can understand that though.  That's just the laws of the land though.

SH:    I've been doing this twenty-some years.  Everybody feel the same way, and I didn't even met some of the man contacts.  It don't make a difference.

CW:    Yeah. Alright.

SH:    U/I...

CW:    Alright That'll work. That'll work.  Hey hey hey Twany?

NL:    What's up man?

CW:    You ready to roll baby?

NL:    Yeah. Let..let's roll..let's roll with it man.

UCE:    He need another car first.  We gotta' help him out.

CW:    [LAUGHS]

UCE:    He's gotta' fix those fenders up.

NL:    You all gotta' fix me up..

UCE:    You gotta' fix those fenders up.

SH:    That's little bitty things.  Cars and all that little shit  That's how this business comes just like that.

UCE:    Alright listen.  I gotta' get...I gotta get back to work cause I gotta' go make some more cheese, you know.

NL:    Alright man.

SH:    U/I..brother.

UCE:    So uh..listen, I'll..I'll be uh...I'll be talkin' to all of you'se and uh...and uh...you know, like I said, Joe's gonna' uh..uh Joe's gonna' handle everything for me and uh he'll be back in touch with you'se, so...so..

NL:    Ok.

UCE:    Hey Steve?

SH:    Yeah?

UCE:    You still there brother? Hey..

SH:    I'm here.

UCE:    Where...you're in Chicago right?

SH:    Right over here in Chi.

UCE:    Yeah you a Bears fan?

SH:    Aww yeah, I'm a Bears fan temporarily cause they, they killin' me man.  They killin' me.

UCE:    Yeah.  Bulls?  You like the Bulls?

SH:    Oh them, hey. My guy, my guy coaches the Bulls, man.

UCE:    You set...set me up with some tickets if I come to town?

SH:    Aw man.

NL:    Oh hell yeah.

UCE:    Oh see, I gotta ask..I gotta' ask for something.  I'm try..I'm tryin'..

SH:    U/I...hey my brother?  Hey my brother?

UCE;    I'm..I'm tryin'..I'm tryin' to recoup a little on that 25, see.

CW:    [LAUGHS]

NL:    [LAUGHS]

SH:    Hey..

UCE:    I gotta' ask.  I gotta' ask.  So..

SH:    Hey listen.  U/I...that 25.  You won't even let it cross your mind.  That's that's pity..that's mediocre.

UCE:    Alright.

SH:     U/I...

CW:     Man you silly as shit man.

UCE:    Yeah but Steve you see..you you see it's 25, but you know what it is?  It's it's my 25, see.

CW:     [LAUGHS]

UCE:    Yeah that's what I'm talkin' about.

SH:     U/I...

UCE:    So...

SH:     Hey..

NL:     Yeah..

SH:     ..hey..we have to...hey..you have to work, that's what I told Joe and my little brother..u/i..

UCE:    Alright..yeah well...

SH:     U/I...quit messin' around with the peons, man, and and deal with the best.  You don't have to run around here to these different spots..

UCE:    Yeah..

SH;     So work with the main source and get a deal.

NL:     That's right.

UCE:    [COUGHS]

SH:     U/I..(under coughing)...do something about that.

UCE:    Yeah...alright listen...

SH:     U/I..when, when....how long you think it's gonna' take before we, uh..get this program to rollin' here?

UCE:    Uh...probably uh..let's say another month.  Well before another month...'bout three weeks..'bout three weeks and we'll..and we'll get it all set up.

SH:     Ok..u/i..hey I'm waitin' on you..

UCE:   And I'll...and I..and I'll and I'll have somethin' for you.

SH:     I'm waitin' on you gentlemen.  Ok...like I said, nice talkin' to you, hey..

UCE:   Alright you all.

SH:     Lookin' forward to doin' a lot of more business here.

UCE:   Well..

CW:     Hey Steve...Happy New Years baby.

UCE:   More will be comin'.

SH:     Same to you all brother.

NL:     Alright brother...

UCE:   Alright I'll talk to you all later.

NL:     Ok..

CW:     Alright..

UCE:    Bye bye.

SH:     Much love..much love..

CW:     Hey hey, you all..u/i...

NL:     Yeah.

CW:     Yeah I'll holler' at you all later man.

NL:     Ok Joe.

CW:     Alright..alright yo..

[CALL ENDED]

# EXHIBIT D

WFO    194C-WF-229363
DATE:    March 11, 2005
TIME:    11:30 am et seq.
1D114

UNDERCOVER EMPLOYEE #3362 (UCE)
COOPERATING WITNESS        (CW)
STEVE HILL                        (SH)

UCE:   Test test 1 2..123.   This is undercover employee number 3362.  Today's date is March 11, 2005.  The time is approximately 11:30 am.  And..uh...we'll be attempting a call to Steve Hill..uh..through the cooperating witness.

[DIAL TONE]

UCE:   Joe how are you?

CW:    What's going on my man?

UCE:   You sick?

CW:    I was sick.

UCE:   [Laughs] You're alright now though, right?

CW:    I'm trying man.  I'm getting it back together.

UCE:   Alright.  Alright go ahead with the call.

CW:    Alright...

UCE:   You calling Steve right?

CW:    Huh?

UCE:   You calling Steve?

CW:    Yeah.

UCE:   Alright.

CW:    Alright.

[RINGING}

CW:     Jorge, you there?

UCE:    Yeah, right here.

SH:     Yeah.

CW:     Yeah what's going on man?

SH:     What's going on little broth?

CW:     Ah shit man...I been sick man.  I had the fucking stomach flu Holmes.

SH:     Aw..I found out man.

CW:     Huh?

SH:     Twan,,Twan called an told me you were sick...he got sick from his daughter.  Whatever his daughter had.

CW:     Yeah man.

SH:     U/I....

CW:     I got my...I got my man on the phone.

SH:     Oh your man on the phone now?

UCE:    Hey Steve.

CW:     Yeah.

UCE:    Steve.

CW:     Hey what's going on?

UCE:    This is George.

SH:     Aw man I been trying to ..George, I've.been trying to call my man...I knew he was sick..I didn't know he was sick until later.

UCE:    Yeah...well he made..he made me sick after what happened out there.  What..what happened?

SH:     Oh what happened out there is basically was uh..a misunderstanding of what we was talking about. Like I told him when my...when my brother went in and put it in, he was trying to get em some uh...get some money out for em right then and there. But our g...our problem u/i..told us  he said look, if they want to get some money out right then and there because what had happened to us recently I told you all about...a bad check had got in...they was trying to like..they gonna take you know a couple weeks for that check even b..be able to clear to get some money out. So he said well you tell them if they send a wire, they can get some money out within a couple days. And Joe said you know they probably send the wire so that's what we was looking at. But uh...we see was a problem on that so that's when we said you couldn't send the wire, don't worry about it. So what I did...I just got in here last night I flew back in. I stayed down there a week...we got what I got so we worked something out.

UCE:   Alright. Who..I mean...

SH:     U/I...

UCE:   ...you...you know this Dan guy? I mean, is he alright?

SH:     He is my brother man.

UCE:   Oh...alright well...

SH:     Yeah yeah so my thing is this.

UCE:   Cause I mean that ain't what we agreed to in the beginning and uh..

SH:     No see what we agreed to...put it in and we didn't care how long it stayed in.

UCE:   Right.

SH:     But see we thought we could get it out...try to soften things quick, but uh...when he was talking about no, with the last one it'll take awhile, we was like well, if they can wire it, so you know he figured, Dan figured well ok they can wire it bro..that'll be quicker then get the money out. But we didn't know how quick you know you want it out or whatever.

UCE:   Alright.

SH:     But uh...the way we did in there we just worked out...I've been trying to call Joe ever since Monday over and over cause my guy worked it out for us. He's sayin' you know we hooked it up with the Bank of America there where Joe at.

UCE:   Alright.

SH:     And so we gave Joe the account number. I got it if you don't have it.

UCE:   Uh huh.

SH:    But he take...he take the account...the account number with him to Bank of America...put it in our account there...and then within 2 days, you can have the funds out.  I have funds out and I'll pay you.

UCE:   Well, I..I'm gonna' be out for about a month so uh...I'm not gonna' be around...so I'll uh...I'll sit down with Joe and we'll..we'll talk and uh...cause I..I..I'd feel more comfortable if Joe's out there...uh..doing the whole thing uh..you know together like we uh..we planned.  Espe...you know especially after the first time, I say, you..you know Dan's uh...Dan's your brother but you know, after that first one with 15 and I only get 25 back I mean, uh...that was uh...

SH:    After the first one what?

UCE:   On that....on that first one, you know how we did 15?  And I only got 25 back?

SH:    Ok.

UCE:   Yeah.  I mean that...that...that's a pretty good hit for me, I mean..you know, so.  Uh..you know we..you can understand with uh...with this much uh...you know I'm...I'm being a little more careful.

SH:    Now well the thing is this..

UCE:   I mean you'd do the same thing, right?

SH:    Right the thing is this...with the 20...on the 15, you got 25...you got more than 25 back.  But I had got 2 separate checks.  I did...cause I didn't..I didn't know how they wanted to do it.  They just told me how to do it.

UCE:   Right.

SH:    So I gave one to uh...to uh...Twan, and one to Joe.

UCE:   Right.

SH:    See I didn't know nothing about all this you know...uh...uh whoever...whoever get...I just went by who they try they made the cashier's checks out...to who they...who they told me to make em out to.  That's all I did...so it's really like...what....4000 something you got back...a little bit off 5000...same as I did.  I didn't get that much cause I have to pay off people.  I really took a loss at it.

UCE:   Yeah.

SH:    But it wasn't no problem cause I was trying to get things situated.

UCE:    Alright, now this..this guy..this guy Dan.  He said he...he works at the bank?

SH:    Huh?

UCE:    He...Dan works at the bank.

SH:    No, Dan don't work at the bank.  Dan..we..we have accounts at the bank for over 25 years.  Our stuff is there.  Our boy a President work the bank.  He the President of the bank.  Joe got a chance to see him and all that.  He was out there..the President of the bank..he was tellin' us you know, he told us how he wanted us to do it and how things go so we started up with the...with the Bank of America right there for when nobody have to be runnin' in and out of town...

UCE:    Alright.  But Dan...but Dan's the one helping you out there, though?

SH:    Oh yeah..oh yeah.

UCE:    Alright.  Well I mean..

SH:    U/I...

UCE::    I mean, you know, if my money's going that way, I mean, am I going to be able to talk to Dan?

SH:    Your money going what way?

UCE:    Out there.  To Vegas.

SH:    Yeah...yeah..I'll be in Vegas.  You and... I be there.  Anything go the same thing...anything happen in Vegas, I'll be there.  That's what happen.  Don't nothing...Dan don't do nothing unless I'm there.

UCE:    U/I...

SH:    He can't do nothing.  I'm his partner and I'm his brother.

UCE:    Alright. U/I..

SH:    He can't do nothing.

UCE:    So...Dan ain't gonna do nothing without you?

SH:    To not a..not a thing.  It's me.  You understand what I'm saying cause my brother's name on the company...this legal deal.  We...we built this together.

UCE:   Alright.

SH:      Right, so my thing is with our bank...all that don't have nothing to do with it....our bank stuff is in order.  Everything situated like I said.  The only thing that got us...like I tell..I told you the first time....the funds just have to be there.  When we do something, whatever we do, at the end the funds have to be there.  Like I said we got a bad check the first time worth 300 some thousand.  We check it out..it's there.  Then when the bank getting ready to make the transition, it's not there.

UCE:   Now what about...what about if I was gonna' let this check...uh..sit?  I mean...would...is Dan the one that uh...that goes in and deposits it?

SH:      Yeah.  U/I...he go in...he just go in...we go in and give it to the uh...the bank or whatever.  It can sit.  If you all want it to sit, it can sit.  But if you want to get it out, like we said, you want to get it out quick, you can deposit it on that end in Wash...you go to any Bank of America in Washington and take our account number and deposit it.  He can have the same check he just got.  I been down the whole week going over this.  We been going over this with the guy.

UCE:   Alright.

SH:      He can deposit the check in Washington.  Same check you got.  Within 2 days, I can get you money out then.

UCE:   Right, that's what I'm sayin'.  It don't take 2 weeks.  It takes..it takes..it takes..uh...it takes..uh, you know, 2 days to..to make a wire, you know, come across...uh..

SH:      Oh you talkin' about the wire?

UCE:   Yeah..

SH:      That..

UCE:   No that's what he was sayin' ...you know he was sayin'...he was sayin'..you, you said, you know, it would take 2 weeks for the check to clear and everything.  It don't take no 2 weeks.

SH:      No no...only reason it take 2 weeks with this..it just...you know how things talk..they just sayin' it because..

UCE:   Right right.

SH:      ...they just gonna' check out everything, you know, they always tell you give em the 14 days...they just said 2 weeks....

UCE:   Right.

SH:    ...on the clearing because the first bad check we had. That's all. When you get a check of that amount...

UCE:   Alright, alright.

SH:    ...and it...and then it go bad, you know how the banks be real pure...they want to put the check out, make sure everything's in order and all that. That's what they tell you. It...it might take less than 2 weeks.

UCE:   Alright.

SH:    That was to just tell people to keep em comfortable, you know?

UCE:   Alright.

SH:    Then 2 week, then when it happen, bam. But now, if you can send the wire, cool...if you don't, you can just take your check...

UCE:   No I'm just saying...I mean...no I would...I'd rather not send the wire. But...you know between...

SH:    Right right that's what I sayin'. You don't have to send the wire. That's why I was..I been down there a whole week. We went over all this. We started something up with the Banks of America in Washington.

UCE:   Yeah.

SH:    We told em...ok we bring the account in...you bring the account number in that we gave Joe...do you still have that account number?

CW:    Oh no...

UCE:   Yeah he.. well...

CW:    Uh..you...you..do you have it Jorge?

UCE:   No...I...I...we're gonna' sit down and talk about what I want to do, but uh...you know..cause I said...like I said, this is a lot of money. I'd...I..I..you know if I...I may even decide to come out cause I...I'd like to talk to Dan. Because I want to make sure, man...this is a lot of money. You know, I know you'd be the same way if it was your money.

SH:    Look, look, look...you can come out...we can come out, sit down, so everything. It don't make a diff.

UCE:   I'll take it...

SH:     Which I don't play no games.  We ain't playing no games here.  My thing was...the whole thing was this.  If he want it...whichever way you want to do it.  You want to do wire, you don't have to wire. Now we got it set up.  You can put it through a bank right there in Washington.  That same check he had.  Now as long as the funds...is the funds still there on that same check?

UCE:   Alright.

SH:     You still have the...do you have the funds there on the same check we just had?

UCE:   Yeah...

SH:     In Vegas?

UCE:   Yeah, but I'm not...uh...you know, I'm not...I'm just not comfortable with that.

SH:     Oh you don't want to use that one?

UCE:   No I mean...no I'm not...I'm talking about the wire.  I just...I rather what we've talked about in the beginning, you know, the way we want to do it.

SH:     Oh you want...you want it to sit there?

UCE:   Yeah..

SH:     You want...you want to just put it in the bank and let it sit?

UCE:   Yeah, but uh...you know, I may uh...you're saying you uh...you been doing business with Dan for 25 years?

SH:     Hey look, we got a family thing here bro.  The best thing to do is you know, like...like you said, if you feel uncomfortable or something, you come down and sit down and talk to us.  Joe met my brother.  We sat down and we go over everything.

UCE:   U/I...

SH:     Joe was right there.  We went over everything and whatever.  And then, you know, that..that will make you feel comfortable cause I ain't about...first of all, I had to deal with money way more than this and this, you know, we just trying to get something did here as a family.  I can...I told you we can do it, we can do it.  I'm a family man.

UCE:   Alright.

SH:    I ain't about all that just like now...we do business, we family.

UCE:   Ok.

SH:    We ain't about running off with no money.  We ain't about beating nobody out of nothing.  This whole thing...if that was the case, I wouldn't even invite nobody in to meet and do all this and that. When I give my bank accounts out, that's personal stuff.  I give it out cause I, hey...it's a family, it's a trust.  We build something here.  We're gonna' do this.  We're gonna' do it.

UCE:   Alright.

SH:    You understand what I'm saying?  We not just going to jump up and move everything for $500,000.  That..that's not nothing.   Our company's worth way more than that.

UCE:   Alright, ok.  Alright...

SH:    So...

UCE:   Well listen...listen we..we still got something going here, so uh...uh I'll be out for about a month and I'll uh...talk with Joe and we'll get back.  But uh..hey uh Joe...

SH:    So now we gonna' do a whole 'nother...we're gonna' do a whole 'nother month now?

UCE:   Well...I'm gonna' be gone.

SH:    That's..that's...that's what I'm sayin'.  You know I...we sat down there with the bank guy going over all this, you know...this'll make things look kind of bad.  When you go in the...you go in the bank and you deal with people and you present a certain thing to him, and then whatever happen, and you come back..you put off, put off.  You make him think you playing games like...

UCE:   No I'm not playing games, I mean the check..look Steve...

SH:    No..uh uh... I'm just sayin'.  Listen to what I'm sayin'  I understand what you said.  You gotta' look at my point from my side.

UCE:   No I understand, but..

SH:    U/I...

UCE:   ...Steve listen the..the check was there.  The check was there.  I wasn't playing games, I mean..

SH:    I understand what I'm sayi'...listen to what I'm sayin', bro.  Understand what I'm sayin'.  I understand the check was there.  The check was there.  And then Joe said you all could wire the

check.

UCE:    Yeah.

SH:    But we gave Joe the check back.

UCE:    Well Joe did...Joe didn't check with me, and that..that's alright, you know...

SH:    But this is what I'm talking about.  But now when we go..we still here and we talking to our people then, ok..tell them to send the check back in...put it in a bank down there..and now we waiting a month to do this on something that supposed to be did, it make it look like you know, ok somebody playing games.  That make the bank want to go through a re..u/i...do all this...we got..we got u/i..stuff set up and we make a paper trail.  Nothing backfire on nobody.

UCE:    No...no..look..

SH:    None of this...everything..everything be good..everything is tight.  Ain't nothing gon...and nobody gonna' have no feedback on nothin' no kind of way.

UCE:    Yeah alright.  Alright.

SH:    U/I...

UCE:    Listen, I...look, I'm in..I'm not even gonna' be around.  What I'm..uh..what I mean by out.  It ain't like I'm not...I'm gonna' be out, out...I'm gonna' be out of the country for about..about a month.  So when I get back, I'll sit with Joe and we'll..we'll take care of it.  But...hey by the way...he..Joe gave me a business card for Ken Barnes?

SH:    U/I...

UCE:    You know him?  You...you know that guy?

SH:    Joe gave you a business card for Ken Barnes?

UCE:    Yeah, he's supposed to be the bank President?

SH:    Tell me the bank...yeah, tell me the bank card he got just that have the account number wrote on?

UCE:    Yeah.

SH:    Do we...do you got that account number there with you?

UCE:  No I'm just...no, no...what I'm sayin'...

SH:    Account number...the account number is on the back of the business card he gave me.

UCE:  Yeah but I...that's what I'm sayin', but do you know that Ken Barnes?  That's what I'm sayin'. The business card.  Do you know the guy that gave you the business card?

SH:    No whoever...I don't know the...my brother got the business card what I'm sayin'...

UCE:  Oh alright...

SH:    Who he got it...the guy wrote it on there.  It could be Ken...

UCE:  Alright...

SH:    ...it could be the Ken Barnes you think, you know...you know, the bank guy, whatever.

UCE:  No I don't know anybody.

SH:    U/I...

UCE:  I don't know anybody.  It was on..it was..

SH:    Oh no, what I'm sayin'...what I'm sayin', do you have the account number.  I'm trying to see if you have the account number on the back of that.

UCE:  Yeah...

SH:    The number on the back of that card?

UCE:  Right, yeah.  No, but..

SH:    That's the...that's the account number...

UCE:  He wrote it on that card.  No, the reason why I'm asking.  I didn't know if that was supposed to be saying something to me like, you know, because then this Dan, you know...uh...I'm just trying to get all these people straight.

SH:    No..u/i...

UCE:  It was on the...it was on the..that's what I'm sayin'...it was uh...the account number was on the business card.  And I just didn't know if you knew him, that's all.

SH:     Ok. Do you have...

UCE:    That's all...that's all it is.

SH:     Do you have...u/i..do you have the account number?

UCE:    Yeah.  Yeah.

SH:     Ok that's what I was asking.  You got the account number right there?

UCE:    Yeah it's on the back of the business card.

SH:     Ok.  So whatever you have to do with that...with that account number.  Go in the Bank of America..whatever you all have to do.  You go in the Bank of America and you can present right in there...put it right in that account number.

UCE:    Alright.

SH:     Whatever thing you want to pull.  And in a couple of days...2 days...you ain't gotta' go a week now.  In 2 days, we can have funds out.

UCE:    Alright.  Ok.

SH:     You know that's you want to do it.  I'm just sayin' but you want to wait a month, you want to wait a month.

UCE:    Alright.

SH:     I was just trying to say, you know.  Now you sayin' you want to wait a month, I'll have to call them up my brother and let the people know and whatever.  Cause I just flew back in Chicago last night.

UCE:    Right.

SH:     We took care of our business on everything.  I've been trying to call all week catch up with Joe.  He been sick.

UCE:    Yeah.

SH:     Trying to catch up with him, so.  To let you know what uh..we had did and what the situation and how it gonna' work.

UCE:    Right.

SH:     That keep people..they ain't gotta' run around.  Then when 2 days thing come up, you just come in, get your money and whatever.  Fly in and whatever, but..that'd be a good way to do it..you ain't gotta' be runnin' in.  Do that just put it in the account there.  Gonna' automatic go..go straight to our account cause that the account number in the Bank of America.

UCE:   Ok.  Alright listen, I'll be back at you in..in..uh...you know, it might be uh, like 3 weeks.  But I'll be back at you.  Joe and I'll give you a call.  Alright?

SH:     Alright my brother.  Appreciate it.

UCE:   Alright Steve.  Alright.  Bye bye.

SH:     Alright bye.

[Call Ends]